J-A18008-19

2019 PA Super 350

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
MICHALE J. ANDERSON :
:
Appellant : No. 711 WDA 2018

Appeal from the Judgment of Sentence April 9, 2018
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-2112299-1989

BEFORE:  BOWES, J., NICHOLS, J., and MUSMANNO, J.

OPINION BY BOWES, J.:                           **FILED NOVEMBER 27, 2019**

Michale J. Anderson appeals from the April 9, 2018 judgment of sentence of fifty years to life imprisonment, following his resentencing for first-degree murder committed as a juvenile, pursuant to **Miller v. Alabama**, 567 U.S. 460 (2012), and **Montgomery v. Louisiana**, 136 S.Ct. 718 (2016). After thorough review, we affirm.

The facts underlying the conviction were summarized by this Court as follows:

> In the early morning hours of October 27, 1989, [Appellant] took a taxicab to the home of the victim, Karen Hurwitz ("Hurwitz").  On his way to Hurwitz's home, [Appellant] had the cab driver stop in the Highland Park area where he retrieved a bag containing various weapons.  After arriving at the Hurwitz residence, [Appellant] removed a Ninja sword and nun chucks from his bag and placed them at the side of the house.  [Appellant] also placed another weapon inside his jacket.  [Appellant] then went into the Hurwitz home.  After speaking with Hurwitz for a few moments, [Appellant] and Hurwitz agreed to continue their conversation outside so as not to awaken Hurwitz's parents. Once

outside, [Appellant] picked up the Ninja sword and walked with the victim to a gazebo in her yard. As the two conversed, [Appellant] struck the victim in the head with the Ninja sword and repeatedly stabbed her in the torso. When the victim stopped moving, [Appellant] went into the Hurwitz home, took the keys to the Hurwitz's automobile, and drove away in the vehicle.

The next morning, [Appellant] voluntarily accompanied police officers from his high school to police headquarters. Upon arriving at headquarters, [Appellant] confessed to the aforementioned crimes.

*Commonwealth v. Anderson*, 754 A.2d 14 (Pa.Super. 2000) (unpublished memorandum at 1-2). Evidence was also adduced at trial that, prior to the murder, Appellant had practiced with the weapons and represented to another that he would soon have a car of a certain make and model that was the same as the car he later stole from the victim's parents.

On June 21, 1990, Appellant was convicted at a jury trial of first-degree murder and theft by unlawful taking, and sentenced to life imprisonment without possibility of parole ("LWOP") and a consecutive term of three and one-half to seven years of imprisonment on the theft charge. On direct appeal, this Court vacated the judgment of sentence and remanded for a hearing on an ineffective assistance of counsel claim. Following an evidentiary hearing, the court determined that trial counsel had not been ineffective, and reinstated Appellant's sentence. Appellant filed a timely appeal to this Court on June 15, 1995, and we vacated Appellant's first-degree murder conviction and remanded for a new trial. The Commonwealth's petition for *allocatur* was

initially granted by the Supreme Court, but subsequently dismissed as improvidently granted.

A second jury trial commenced on June 8, 1998, before the Honorable Lawrence J. O'Toole and a jury. Appellant was found guilty, and the court sentenced him on June 12, 1998, to life imprisonment without parole on the first-degree murder conviction. Again, Appellant timely appealed to this Court, and we affirmed judgment of sentence on February 3, 2000. **Commonwealth v. Anderson**, 754 A.2d 14 (Pa.Super. 2000) (unpublished memorandum), *allocatur den.* 759 A.2d 919 (Pa. 2000).

Appellant's first PCRA petition was dismissed in 2008, after several remands for additional hearings and determinations. The instant petition, his second, was filed on July 24, 2012. Counsel filed an amended petition in light of **Miller** and **Montgomery** on January 27, 2016, a resentencing hearing was scheduled, and the Commonwealth filed its notice of intention to seek a LWOP sentence.

At the resentencing hearing on February 2, 2018, and April 5-9, 2018, the court heard testimony offered on Appellant's behalf from two corrections officers, who described him as a model prisoner. In addition, representatives from prisoner advocacy programs described his initiative and participation, and a former inmate attributed much of his success upon release to inspiration he received from Appellant. The victim's parents described their only child's brutal death at Appellant's hand, the devastating impact of her murder upon

them, their extended family, and her high school friends. Two family friends recounted how the murder continues to traumatize the entire community.

The court heard extensive testimony from board-certified psychiatrist Bruce Wright, M.D., who met with Appellant and reviewed records from the police, school, and medical providers. Noting that Appellant had been diagnosed at various times with PTSD, Antisocial Personality Disorder, Dissociative Disorder, and Personality Disorder, Dr. Wright maintained that an accurate diagnosis could not be reached because of the inaccurate history Appellant provided and his deceptiveness. N.T., 4/5/18, at 33. He opined further that, although proper treatment could not be devised without a diagnosis, Appellant had informed prison authorities that he would not participate in additional psychological therapy. He assessed Appellant's chances at a successful rehabilitation as "negligible at best[,]" but stopped short of saying he was incorrigible. N.T., 4/5/18, at 51.

Appellant offered the testimony from psychologist Alice Applegate, Ph.D. She agreed with Dr. Wright that Appellant was very bright, but disagreed that he was manipulative. She pointed to the absence of violent behavior during Appellant's twenty-eight year tenure in prison, the fact he obtained his GED, tutored other prisoners, and participated in criminal justice reform, as proof that he is rehabilitated. Dr. Applegate stated Appellant had stabilized mentally, no longer has mood swings, and feels remorse for the crime. She opined that he is not a psychopath, nor antisocial, although she conceded that

he demonstrated a moderate level of mental disorder. She diagnosed Appellant with Generalized Anxiety Disorder, PTSD in remission, and a history of Chronic Adjustment Disorder, Unspecified Dissociative Disorder, Compulsory Personality Disorder, Developmental Trauma Syndrome, homelessness, and adolescent antisocial behaviors, and opined that during the murder, he had no control over his thoughts, behaviors, or emotions and did not know he was dissociating.

Finally, Appellant addressed the court at length, offering his contrary version of the facts documented about his early life and numerous reasons why he believed he should receive a lighter sentence. Following the hearing, the sentencing court found that the Commonwealth had not sustained its burden of proving that Appellant was incorrigible and that rehabilitation was impossible, and refused to impose a LWOP sentence. Nonetheless, it rejected the notion that Appellant was rehabilitated, and found him to be a danger to the community. After applying the various sentencing factors, the court resentenced Appellant to a term of fifty years to life imprisonment on the first-degree murder conviction.

Appellant's post-sentence motion was denied, and thereafter, he timely filed this appeal, and both he and the sentencing court complied with Pa.R.A.P. 1925. Appellant presents two issues for our review:

> 1. Is it unconstitutional to impose a sentence of 50 years to life, a *de facto* sentence of life without the possibility of parole, where the trial court found that [Appellant] is not one of those

- 5 -

rare and uncommon juveniles who is permanently incorrigible, irreparably corrupt or irretrievably depraved?

2.  Did the trial court err in imposing a sentence of 50 years to life, whether as a *de facto* life sentence or otherwise, without fully addressing all the pertinent criteria set forth in 18 [Pa.C.S.] § 1102.1(a)?

Appellant's brief at 2.

Appellant's first issue presents a challenge to the legality of his sentence of fifty years' imprisonment to life after **Miller** and **Montgomery**. He contends that the sentence was a *de facto* life sentence without possibility of parole because he would not be eligible for parole until the age of sixty-seven. Consequently, he maintains that it was unconstitutional as it was imposed without the findings required by **Miller**, **Montgomery**, and **Commonwealth v. Batts**, 163 A.3d 410 (Pa. 2017) ("**Batts II**"), for imposition of a LWOP sentence. Appellant's brief at 27. In **Batts II**, our Supreme Court held that a LWOP sentence is permitted for a juvenile convicted of first-degree murder only if the circumstances of the crime indicate that the offender is permanently incorrigible, and incapable of rehabilitation.

In support of his contention that the minimum term of fifty years imposed herein is a *de facto* LWOP sentence, Appellant directs our attention to **Commonwealth v. Foust**, 180 A.3d 416 (Pa.Super. 2018) (upholding sentence of two consecutive thirty-year terms to life imprisonment and declining to aggregate the two terms for purposes of the **Miller** and **Batts II** analysis). Specifically, Appellant points to language therein, cautioning courts

against imposing lengthy minimum term sentences that constitute *de facto* life imprisonment without parole in order to circumvent the prohibition against LWOP sentences. Appellant also references **Commonwealth v. Felder**, 187 A.3d 909 (Pa. 2018), in which our Supreme Court granted *allocatur* to address this Court's holding in an unpublished memorandum that a sentence of fifty-years-to-life imposed upon a juvenile did not constitute a *de facto* life sentence without parole subject to the findings of permanent incorrigibility and irreparable corruption articulated in **Batts II**. Appellant raises virtually the same issue herein.

Appellant argues that he has been incarcerated for thirty years; it will be twenty more years before he is eligible for parole, at which time he will be sixty-seven years old. He cites **Commonwealth v. Bebout**, 186 A.3d 462, 469-72 (Pa.Super. 2018), as defining the upper limit of a constitutional sentence in this context as: "whether there is some meaningful opportunity [for the defendant] to obtain release based on demonstrated maturity and rehabilitation" while it is "at least plausible that one could survive until the minimum release date" with some likelihood that a non-trivial amount of time at liberty awaits. Appellant's brief at 29. Appellant contends that the trial court herein intended to deny him that opportunity because it believed him to be "a seriously dangerous man" who has not been rehabilitated. **Id**. at 30 (citing Trial Court Opinion, 9/12/18, at unnumbered 10).

The Commonwealth argues that Appellant's age of sixty-seven when he is eligible for parole will likely permit him to have a meaningful life outside prison if paroled. Commonwealth's brief at 15. Thus, it contends that his sentence is not a *de facto* LWOP sentence, and no finding that Appellant was "permanently incorrigible, irreparably corrupt, or irretrievably depraved" was required before imposing it. Commonwealth's brief at 16.

This issue arises from the recognition by the United States Supreme Court that evolving standards of decency mandate that juveniles receive proportionate sentences that take into account their youthfulness and the characteristics of youth. In *Roper v. Simmons*, 543 U.S. 551, 569-70 (2005), the Court prohibited the execution of juveniles, recognizing that juveniles engage in reckless and impulsive behavior due to their "lack of maturity," "underdeveloped sense of responsibility," and vulnerability to peer pressure. In *Graham v. Florida*, 560 U.S. 48, 68 (2010), the Court held that a mandatory LWOP sentencing scheme for a juvenile convicted of a non-homicide offense was cruel and unusual punishment barred by the Eighth Amendment. It relied upon *Roper*, *supra* at 569-70, in finding that such a scheme precluded consideration of a juvenile's "lessened culpability" and greater capacity for change, and hence, ran afoul of the requirement that sentences be individualized.

In *Miller*, the Court struck down as unconstitutional mandatory LWOP for juveniles convicted of murder. It recognized that a lifetime in prison is a

disproportionate sentence for most children, reserving it for those whose crimes reflected irreparable corruption for whom rehabilitation was impossible. The *Montgomery* Court adopted this rationale espoused in *Miller*, and reasoned further that, for a sentence of life without parole to be proportionate for a juvenile murderer, the sentencing court must find "that there is no possibility that the offender could be rehabilitated at any point later in his life, no matter how much time he spends in prison and regardless of the amount of therapeutic interventions he receives, and that the crime committed reflects the juvenile's true and unchangeable personality and character." *Montgomery*, 136 S.Ct. at 733. The *Montgomery* Court left it up to the individual states, however, to establish a procedure for the proper implementation of *Miller*.

In the aftermath of *Miller* and *Montgomery*, our High Court decided *Batts II*, wherein the Court recognized a presumption against the imposition of a LWOP sentence for a juvenile offender. In order to overcome that presumption, the *Batts II* Court held that the Commonwealth would have to prove that "the juvenile is constitutionally eligible for the sentence beyond a reasonable doubt" by presenting evidence relating to the factors announced in *Miller*, and our legislature's response to *Miller*, codified at 18 Pa.C.S. § 1102.1. *Batts II*, *supra* at 455. Although the latter statute does not apply to juveniles convicted prior to *Miller*, the *Batts II* Court reasoned that § 1102.1(a) would "help frame the exercise of judgment by the court in

imposing a sentence and may provide an essential starting point . . . when determining the appropriate minimum sentence for a juvenile convicted of first-degree murder prior to the **Miller** decision." **Id**. at 481 (internal quotations omitted). The Court noted, however, that,

> If, after a hearing and consideration of all of the evidence presented, the sentencing court finds that the Commonwealth has satisfied its burden of proving beyond a reasonable doubt that the juvenile is so permanently incorrigible that rehabilitation of the offender would be impossible, the bar against sentencing a juvenile offender to life without the possibility of parole is lifted.

**Id**. at 457. Nonetheless, the Court made it clear that, even in circumstances where the Commonwealth adduced such proof, "the sentencing court still had the discretion to impose a sentence that would permit consideration of parole." **Id**.

In **Batts II**, our High Court found that **Miller** requires examination of the following factors:

> At a minimum it should consider a juvenile's age at the time of the offense, his diminished culpability and capacity for change, the circumstances of the crime, the extent of his participation in the crime, his family, home and neighborhood environment, his emotional maturity and development, the extent that familial and/or peer pressure may have affected him, his past exposure to violence, his drug and alcohol history, his ability to deal with the police, his capacity to assist his attorney, his mental health history, and his potential for rehabilitation.

**Batts II** at 421 (quoting **Commonwealth v. Batts I**, 66 A.3d 286, 297 (Pa. 2013) ("**Batts I**"), and **Commonwealth v. Knox**, 50 A.3d 732, 745 (Pa.Super. 2012)).

Title 18 Pa.C.S. § 1102.1 provides in pertinent part:

- 10 -

(a)  First degree murder. — A person who has been convicted, after June 24, 2012, of a murder of the first degree, first degree murder of an unborn child or of murder of a law enforcement officer of the first degree and who was under the age of 18 at the time of the commission of the offense shall be sentenced as follows:

> (1) A person who at the time of the commission of the offense was 15 years of age or older shall be sentenced to a term of life imprisonment without parole, or a term of imprisonment, the minimum of which shall be at least 35 years to life.

18 Pa.C.S. § 1102.1(a)(1).

In making a determination under § 1102.1, the court is required to consider and make findings on the record related to the following factors:

(1)   The impact of the offense on each victim, including oral and written victim impact statements made or submitted by family members of the victim detailing the physical, psychological and economic effects of the crime on the victim and the victim's family.  A victim impact statement may include comment on the sentence of the defendant.

(2)   The impact of the offense on the community.

(3)   The threat to the safety of the public or any individual posed by the defendant.

(4)   The nature and circumstances of the offense committed by the defendant.

(5)   The degree of the defendant's culpability.

(6)   Guidelines for sentencing and resentencing adopted by the Pennsylvania Commission on Sentencing.

(7)   Age-related characteristics of the defendant, including:

(i) Age.

(ii) Mental capacity.

- 11 -

(iii) Maturity.

(iv) The degree of criminal sophistication exhibited by the defendant.

(v) The nature and extent of any prior delinquent or criminal history, including the success or failure of any previous attempts by the court to rehabilitate the defendant.

(vi) Probation or institutional reports.

(vii) Other relevant factors.

18 Pa.C.S. § 1102.1(d).

Herein, the sentencing court held an evidentiary hearing that consumed several days. In addition, the court had the benefit of sentencing memoranda, Department of Corrections' reports, psychiatric and psychological reports spanning three decades, victim impact statements, Appellant's extensive allocution, and the testimony of numerous witnesses. The sentencing court weighed the *Miller* factors, took note of 18 Pa.C.S. § 1102.1(a)(1) and (d), and considered the general factors contained in § 9721(b) of the Sentencing Code. It made extensive findings of fact, credibility determinations, and provided a lengthy explanation of its findings. Although the Commonwealth asked the sentencing court to impose a LWOP sentence, the court refused to do so, finding that the Commonwealth had not met its burden of proving beyond a reasonable doubt that Appellant was incorrigible and not amenable to rehabilitation. Based on the record, the sentencing court imposed a fifty years to life imprisonment sentence.

Pennsylvania does not recognize a definitive term of imprisonment as a *de facto* LWOP sentence. Nor have we determined that there is a particular age at time of earliest release that is presumptively the equivalent of a life sentence. In **Foust**, this Court examined whether either of the appellant's two thirty-years-to-life sentences constituted a *de facto* LWOP sentence. In concluding that the sentences had to be viewed separately, and that neither constituted a *de facto* life sentence, this Court refused to draw a bright line or determine the relevancy of factors such as life expectancy generally, or of the prison population in particular, or whether a non-LWOP sentence had to afford the defendant the possibility of a "meaningful post-release life." **Id**. at 438. This Court had no trouble concluding therein that a 150-year-minimum term sentence was a *de facto* LWOP sentence, but that a sentence of thirty years to life imprisonment was not.

In **Bebout**, **supra**, we cited language in **Graham**, **supra** at 75, mandating that states "give defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" as the key factor in considering the upper limit of what constitutes a constitutional sentence in this narrow context. We reasoned further that it was implicit in such a standard that "it would not be meaningful to provide an opportunity for release based solely on the most tenuous possibility of a defendant's surviving the minimum sentence imposed." **Bebout**, **supra** at 468. "[T]o be **potentially** meaningful, it must at least be **plausible** that one could survive

. . . with some consequential likelihood that a non-trivial amount of time at liberty awaits." *Id*. (emphasis in original). Bebout argued that his forty-five years to life sentence, which would make him eligible for parole at age sixty, was a *de facto* life sentence because he was a member of a subset of individuals sentenced to life imprisonment as juveniles in Michigan with a life expectancy of 50.6 years. He also pointed to other government data that indicated a life expectancy for American males of seventy-six years of age. This Court rejected the statistical life-expectancy approach for determining what constitutes a *de facto* LWOP sentence because it merely created new questions "sending us down a rabbit hole . . . as more and more data arrives." *Id*. at 469. Instead, we looked to *Foust*, and ultimately concluded that the forty-five-year minimum sentence was not so long as to make it virtually certain that Bebout could not survive it, and it was plausible that he could live many years beyond it.

In *Commonwealth v. Lekka*, 210 A.3d 343 (Pa.Super. 2019), this Court applied *Bebout* in affirming Appellant's forty-five years to life sentence. We found that Appellant had not demonstrated that he had no plausible chance of survival until he completed his minimum sentence, nor meaningful opportunity to enjoy his freedom at sixty-two years of age, only two years longer than the defendant in *Bebout*. *See also Commonwealth v. Hernandez*, ___A.3d___, 2019 PA Super 255 (Pa.Super. August 21, 2019) (unpublished memorandum) (affirming aggregate sentence of forty-five years

to life imprisonment that would render the appellant eligible for parole at sixty-two years of age).

Admittedly, Appellant herein will be sixty-seven years old, five years older than Lekka and Hernandez, when he is first eligible for parole. He argues that his sentence must "provide an opportunity for release based solely on the most tenuous possibility of a defendant surviving the minimum sentence imposed." Appellant's brief at 29 (quoting **Bebout**, **supra** at 468). He contends it must be "at least plausible that one would survive until to the minimum release date with some consequential likelihood that a non-trivial amount of time at liberty awaits." **Id**. Nonetheless, he stops short of demonstrating how the fifty-year minimum sentence imposed herein violates those parameters. Appellant, while urging this Court to apply the reasoning in **Bebout**, fails to establish that it is unlikely he will survive until his minimum release date, or that there is no opportunity for release in such time as to permit him to enjoy a period of liberty. We are not willing to presume, without more, that a fifty-year minimum sentence in these circumstances affords him no reasonable possibility of release or a meaningful life thereafter.

Instead, Appellant makes bald claims accusing the sentencing court of intentionally imposing a term-of-years sentence that was tantamount to a LWOP sentence in order to evade Eighth Amendment law. Appellant's brief at 29-30. Not only is the allegation wholly unsupported by the record, it is particularly baseless herein as LWOP was available to the sentencing court.

On the record before us, Appellant has simply provided no basis for us to conclude that his fifty-year to life sentence was an illegal *de facto* life sentence without parole.

Appellant's second issue, that the sentencing court failed to address all the appropriate criteria set forth in § 1102.1 prior to imposing sentence, presents a challenge to the discretionary aspects of his sentence. **See Commonwealth v. White**, 193 A.3d 977, 984 (Pa.Super. 2018). It is well established that challenges to the discretionary aspects of sentencing do not entitle an appellant to an appeal as of right. **Commonwealth v. Sierra**, 752 A.2d 910 (Pa.Super. 2000). Prior to reaching the merits of a discretionary sentencing issue, we must first determine whether he has preserved it in a post-sentence motion, filed a timely notice of appeal, included in his brief at Pa.R.A.P. 2119(f) statement, and presented a substantial question for review. **Commonwealth v. Moury**, 992 A.2d 162, 170 (Pa.Super. 2010).

The appeal is timely. Appellant's brief contains the requisite Rule 2119(f) statement. However, a fair reading of Appellant's post-sentence motion reveals that he did not raise this discretionary aspect of sentence issue in the motion, nor did he assert it at resentencing.[1] Thus, the issue is waived.

---

[1] In his post-sentence motion, Appellant pled the following:

A. The sentence of fifty (50) to life is a *de fac*to life sentence and therefore unconstitutional. **See Commonwealth v. Foust**, (Pa. Super. 2018), 218 Pa.Super. LEXIS 150 (February 21,

*See Commonwealth v. Cartrette*, 83 A.3d 1030 (Pa.Super. 2013) (*en banc*) (reaffirming that unless issue challenging discretionary aspects of a sentence is raised in a post-sentence motion or during the sentencing proceeding, it is waived); *see also Commonwealth v. Griffin*, 65 A.3d 932 (Pa.Super. 2013) (holding objections to discretionary aspects of sentence waived if not raised at the sentencing hearing or in a timely filed post-sentence motion).

Judgment of sentence affirmed.

Judge Musmanno joins the opinion.

Judge Nichols concurs in the result.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

---

2018) at pages 26-33. *See also United States v. Grant*, ___F.3d.___ (3d.Cir. 2018) No. 16-3820 (April 9, 2018).

B. The sentencing court erred by allowing victim impact statements in violation of the statute when neighbors testified as to the impact of the crime upon the community.

C. The sentencing court should reconsider the sentence. Defendant would present the attached documents for review by the court.

Post-Sentencing Motions, 4/17/18, at 1.

J-A18008-19

Date: <u>11/27/2019</u>