J-A05009-21

2021 PA Super 132

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JESSE MCGRATH | : | |
| | : | |
| Appellant | : | No. 554 EDA 2020 |

Appeal from the Judgment of Sentence Entered December 17, 2019
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR-0006508-1986

BEFORE:   OLSON, J., NICHOLS, J., and STEVENS, P.J.E.[*]

OPINION BY OLSON, J.:                            **FILED JUNE 28, 2021**

Appellant, Jesse McGrath, appeals from the judgment of sentence

entered on December 17, 2019 following resentencing.  We affirm.

As set forth by the trial court, the facts and procedural history of this

case are as follows:

> On September 21, 1986[,] Appellant raped, stabbed, and robbed
> [an 84-year-old woman] in her home in Clifton Heights, Delaware
> County, Pennsylvania.  [The victim] lived through the brutal attack
> but died [13] days later from the injuries she sustained.  [The
> events preceding the attack were as follows.  After] cutting the
> grass of [the victim's] next door neighbor[, Appellant] knocked on
> [the victim's] door and asked to borrow lawn trimmers. Shortly
> after, Appellant returned the trimmers to [the victim] who
> permitted Appellant to come inside [her home] for a drink.
> Following a few minutes of small talk, Appellant grabbed a knife
> from [the victim's] kitchen and forced her upstairs into her
> bedroom.  Appellant raped [the victim] and stabbed her [six]
> times in her torso, perforating her liver and pancreas and
> contributing to her ultimate demise; Appellant also punctured [the
> victim's] left eye. Following the attack, [the victim] was awake

_____

[*] Former Justice specially assigned to the Superior Court.

and alert, and [she] provided to the police statements about the attack; in a recorded statement [the victim] provided details about the rape and stabbing and her attempts to get Appellant to stop. Appellant was [16] years old when he committed the criminal offenses that led to [the victim's death], and he was charged with murder of the first degree, robbery, rape, and related charges. [At the time charges were filed, Appellant had five pending] petitions in juvenile court, and all were dismissed following the institution of the 1986 criminal proceedings for the murder of [the victim in this case]. Initially, the Commonwealth sought imposition of the death penalty. On June 22, 1987[,] following jury selection but before testimony commenced[,] Appellant tendered a plea of guilty before the Honorable William R. Toal to the charge of murder of the first degree and robbery as a felony of the first degree. As part of the plea agreement, the Commonwealth agreed to not seek imposition of the death penalty. Immediately following the entry of the plea, Judge Toal sentenced Appellant to serve a term of life without parole for the [first-degree murder] conviction. A review of the record reveals Appellant did not file post-sentence motions or appeal his 1987 [judgment of] sentence.

The record also discloses Appellant suffered from [a] learning and intellectual disability, schizophrenia, borderline mental retardation, possible ADHD, alcohol abuse, polysubstance abuse, and Appellant was immature and impulsive. Appellant admittedly inhaled gasoline fumes and sprayed insecticide into his mouth, and Appellant was fired from [previous employment] because he [consumed alcohol] on the job. Appellant's I.Q. measures low as evidenced for example by 1977, 1981, and 1987 evaluations placing Appellant in the borderline range of mental retardation. Appellant twice repeated grade levels in school[ and attended the Vanguard School for a time. Appellant dropped out of school in ninth grade and did not finish high school]. Appellant was raised in a family with a parent and five siblings who suffered from untreated mental health and intellectual disabilities, including schizophrenia, depression, and paranoia. At the time of the criminal incident, Appellant lived in Clifton Heights, Pennsylvania with his family, Appellant's parents were married, and Appellant maintained good relationships with his family members.

In June 2012, the United States Supreme Court held [that mandatory] sentences of life without parole for juveniles [were unconstitutional]. *See Miller v. Alabama*, 567 U.S. 460 (2012). In January 2016, the United States Supreme Court held *Miller*

- 2 -

applies retroactively to cases decided prior to the 2012 court ruling. *See Montgomery v. Louisiana*, 577 U.S. [190] (2016). In June 2017[,] the Supreme Court of Pennsylvania held *Miller* and *Montgomery* require procedural safeguards to ensure that life without parole sentences were meted out only to "the rarest of juvenile offenders" whose crimes reflected "permanent incorrigibility," "irreparable corruption" and "irretrievable depravity" and recognized a presumption against the imposition of a sentence of life without parole for a juvenile offender. [*Commonwealth v. Batts*, 163 A.3d 410 (Pa. 2017)("*Batts II*"), *abrogated by*, *Jones v. Mississippi*, 141 S. Ct. 1307 (2021)[1].] To rebut this presumption, the Commonwealth bears the burden of proving beyond a reasonable doubt the juvenile offender incapable of rehabilitation. [*Id.*] Additionally, the Pennsylvania General Assembly passed 18 Pa.C.S.[A.] § 1102.1 concerning sentencing for juveniles convicted of first[-degree] and second[-]degree murder after June 24, 2012. *See* 18 Pa.C.S.[A.] § 1102.1.

\* \* \*

On October 15, 2014 Appellant filed a *pro se* [] petition [pursuant to the Post Conviction Relief Act (PCRA)] and on March 18, 2016 a counseled PCRA petition was filed alleging his sentence [wa]s illegal under *Montgomery* and *Miller*. On January 12, 2017[,] an order appointing [new counsel] was entered. Following a series of status conferences and determination of issues related to Appellant's resentencing, on November 15, 2019[,] a sentencing hearing was held before [the trial] court. On December 17, 2019[, the trial] court entered an order sentencing Appellant to confinement for a minimum term of 48 years to a maximum of life. On December 20, 2019[, appellate counsel] was appointed to represent Appellant in further proceedings. On December 26, 2019, Appellant filed a [m]otion for [r]econsideration of

---

[1] *Batts II* was recently abrogated by the United States Supreme Court in *Jones v. Mississippi*, 141 S. Ct. 1307 (2021). The *Jones* Court confirmed that mandatory sentences of life without the possibility for juvenile offenders violate the cruel and unusual punishment clause of the Eighth Amendment of the United States Constitution, but held that sentencing schemes which allow the discretionary imposition of life sentences pass constitutional muster and need not require a separate factual finding of permanent incorrigibility before doing so.

[s]entence. On January 14, 2020[,] Appellant's motion was denied.

Trial Court Opinion, 6/3/2020, at 1-5 (record citations and footnote omitted).

This timely appeal resulted.[2]

Appellant presents the following issues for our review:

1. Is it unconstitutional to sentence a juvenile to [48] years to life, a *de facto* sentence of life imprisonment without the possibility of parole, despite a finding that the juvenile was not permanently incorrigible, irreparably corrupt[,] or irretrievably depraved?

2. Are the standards for determining what constitutes a *de facto* life sentence different for juveniles with severe intellectual and mental health disabilities?

Appellant's Brief at 3.

In his first issue presented, Appellant argues his "48 years to life sentence creates a *de facto* life without parole sentence that unconstitutionally deprives him of a meaningful opportunity for parole as he is not one of the rare and uncommon juveniles who is irreparably corrupt." ***Id.*** at 10-11. Citing decisions from California, Connecticut, and Iowa, Appellant contends "[t]his Court has not yet determined what constitutes a *de facto* life sentence. Other jurisdictions, however, have considered such lengthy sentences." ***Id.*** at 11-16. Appellant maintains:

---

[2] Appellant filed a notice of appeal on February 3, 2020. On March 2, 2020, the trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied timely. On June 3, 2020, the trial court issued an opinion pursuant to Pa.R.A.P. 1925(a).

> [He] will be 65 [years old] before he is eligible for parole. The statistics and research show the average life expectancy of a [juvenile homicide offender] of normal health and intelligence to be 50.6 years. Combine the decreased life expectance with the many physical and mental health issues he has and [Appellant] will die in prison, never having the opportunity for meaningful release.

*Id.* at 16. Moreover, Appellant argues "[t]he resentencing court made no finding that [Appellant] was irreparably corrupt, permanently incorrigible, or irretrievably depraved" as required when imposing a *de facto* life sentence without the possibility of parole. *Id.* at 18.

We have previously determined that a claim that the trial court imposed an impermissible *de facto* life sentence in violation of **Miller** constitutes a challenge to the legality of sentence. **See Commonwealth v. Clary**, 226 A.3d 571, 580 (Pa. Super. 2020). This Court has stated:

> A claim challenging a sentencing court's legal authority to impose a particular sentence presents a question regarding the legality of the sentence. The determination as to whether a trial court imposed an illegal sentence is a question of law; an appellate court's standard of review in cases dealing with questions of law is [*de novo* and our scope of review is plenary].
>
> A trial court may not impose a term-of-years sentence on a juvenile convicted of homicide that equates to a *de facto* [life without parole ("LWOP")] sentence unless it finds, beyond a reasonable doubt, that the juvenile is incapable of rehabilitation.

*Id.* at 580–581 (internal citations omitted).

We further explained:

> In **Miller**, the U.S. Supreme Court held that it was unconstitutional to impose mandatory LWOP sentences for defendants who committed their crimes while under the age of 18. **Miller**, 567 U.S. at 465[.] The Court nonetheless opined that a LWOP sentence is still a viable sentence for "the rare juvenile

offender whose crime reflects irreparable corruption," and a judge or jury must consider individualized characteristics and circumstances, including an offender's youth and attendant characteristics, before imposing this harshest possible penalty. *Id.* at 479-480, 483, 489[.] In *Montgomery*, the U.S. Supreme Court held that its decision in *Miller*, *supra*, applies retroactively. *Montgomery*, 136 S.Ct. at 732. The Court "expressly left it to the States to determine how the holding in *Miller* was to be implemented in state court proceedings." *Commonwealth v. Batts*, 163 A.3d 410, 432 (Pa. 2017) ("*Batts II*") (citation omitted).

In *Batts II*, our Supreme Court concluded "that to effectuate the mandate of *Miller* and *Montgomery*," it would provide a procedural safeguard to ensure that LWOP sentences "are meted out only to 'the rarest of juvenile offenders' whose crimes reflect 'permanent incorrigibility'" by recognizing a presumption against the imposition of a LWOP sentence for a juvenile offender. *Batts II*, 163 A.3d at 415-16. Therefore, if the Commonwealth seeks a LWOP sentence for a juvenile offender, it must prove beyond a reasonable doubt that the offender "exhibits such irretrievable depravity that rehabilitation is impossible." *Id.* at 455 (*quoting Montgomery*, *supra* at 733) (emphasis omitted). If the Commonwealth satisfies its burden of proof, the sentencing court has discretion to impose a LWOP sentence upon the juvenile offender. *Batts II*, *supra* at 460.

When the Commonwealth requests a sentence of LWOP, the sentencing court must consider the *Miller* and Section 1102.1(d)[fn A] factors on the record, before imposing a sentence. *Commonwealth v. Machicote*, 206 A.3d 1110, 1120 (Pa. 2019); *Batts II*, *supra* at 459-60. If the court imposes the requested LWOP sentence, it "must find that the juvenile offender is permanently incorrigible and that rehabilitation would be impossible." *Batts II*, *supra* at 459.[3]

However, if [] the court sentences "a juvenile offender to a life with the possibility of parole, traditional sentencing considerations apply," and the court considers the factors set forth in 42

---

[3] As mentioned previously, *Batts II* was recently abrogated by *Jones*. The *Jones* Court held that a separate factual finding of permanent incorrigibility is not necessary before imposing a discretionary life sentence for juvenile offenders. *See Jones*, 141 S. Ct. at 1318–1319.

Pa.C.S.A. § 9721(b); ***Batts II***, ***supra*** at 460 (citation omitted[)].
Section 9721(b) provides that the court shall fashion a sentence
"that is consistent with the protection of the public, the gravity of
the offense as it relates to the impact on the life of the victim and
on the community, and the rehabilitative needs of the defendant."
42 Pa.C.S.A. § 9721(b).

Thus, where [] the sentencing court rules in a defendant's favor
by declining the Commonwealth's request to sentence the
appellant to LWOP, on appeal, we need not review whether the
court properly considered the ***Miller*** factors. Rather, we review
the appellant's sentence as we would any other sentence imposed
pursuant to Section 9721(b). ***See Batts II***, ***supra*** at 460.

[fn A] [….T]he sentencing court is required to consider and make
findings on the record related to the following factors:

(1) The impact of the offense on each victim, including oral
and written victim impact statements made or submitted by
family members of the victim detailing the physical,
psychological and economic effects of the crime on the
victim and the victim's family. A victim impact statement
may include comment on the sentence of the defendant.

(2) The impact of the offense on the community.

(3) The threat to the safety of the public or any individual
posed by the defendant.

(4) The nature and circumstances of the offense committed
by the defendant.

(5) The degree of the defendant's culpability.

(6) Guidelines for sentencing and resentencing adopted by
the Pennsylvania Commission on Sentencing.

(7) Age-related characteristics of the defendant, including:

(i) Age.

(ii) Mental capacity.

(iii) Maturity.

(iv) The degree of criminal sophistication exhibited by the
defendant.

> > (v) The nature and extent of any prior delinquent or criminal history, including the success or failure of any previous attempts by the court to rehabilitate the defendant.
>
> > (vi) Probation or institutional reports.
>
> > (vii) Other relevant factors.
>
> 18 Pa.C.S.A. § 1102.1(d).

*Id.* at 577–578 (original brackets omitted).

> Additionally, we have opined:
>
> > This [C]ourt has distinguished between [] sentences which constitute *de facto* LWOP sentences and those that do not. [***See Commonwealth v. Foust***, 180 A.3d 416, 438 (Pa. Super. 2018)].
> >
> > In ***Foust***, this Court concluded that a 150–year sentence is a *de facto* LWOP sentence and a 30 years' to life sentence does not constitute a *de facto* LWOP sentence. ***Id.***
> >
> > For sentences that fall between the clearly constitutional and unconstitutional parameters, we have concluded that a sentence is not a *de facto* LWOP sentence where there is "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." ***Commonwealth v. Bebout***, 186 A.3d 462, 467 (Pa. Super. 2018) (citation omitted). Thus, "it must at least be plausible that one could survive to the minimum release date with some consequential likelihood that a non-trivial amount of time at liberty awaits." ***Id.*** at 468 (emphasis omitted). If there is no meaningful opportunity for parole, the sentence constitutes a *de facto* LWOP sentence. ***Id.*** We, therefore[,] consider the age the appellant would be eligible for parole to determine whether the new sentence is the functional equivalent of LWOP. ***Id.***
> >
> > In ***Commonwealth v. Anderson***, 224 A.3d 40, 47-48 (Pa. Super. 2019), a post-***Miller*** case, the appellant received a sentence of 50 years' to life imprisonment upon resentencing. [***See Anderson***,] 224 A.3d at 41-42. Because Anderson was 17 years old at the time he began serving his sentence, he would, thus, be eligible for parole at age 67. ***Id.*** at 46-47. We, therefore, concluded that his sentence was not the functional equivalent of LWOP. ***Id.*** at 47-48[;] ***see also Bebout***, ***supra*** at 468

(concluding the appellant's 45 years' to life sentence in which he would be eligible for parole at the age of 60 was not *de facto* LWOP); ***Commonwealth v. Lekka***, 210 A.3d 343, 357-358 (Pa. Super. 2019) (concluding that because the appellant's term of 45 years' to life imprisonment rendered him eligible for parole at the age of 62, it was not a *de facto* LWOP sentence); ***Foust***, ***supra*** at 438, 441 (concluding that the appellant's two consecutive 30 year to life sentences were not a *de facto* LWOP sentence and noting that even considering [the a]ppellant's aggregate sentence, he had a chance of being released into society in his 70s).

*Id.* at 580-582 (ultimately concluding that, in view of Clary's eligibility for parole for his first-degree murder conviction at age 58, he had a meaningful opportunity to obtain release and his sentence could not be considered *de facto* life without the possibility parole).

Here, the trial court imposed a total sentence of 48 years to life imprisonment for Appellant's first-degree murder conviction. The trial court, recognizing that Appellant will be 65 years old when he becomes eligible for parole, determined that its sentence, therefore, did not constitute an illegal, *de facto* life sentence. **See** Trial Court Opinion, 6/3/2020, at 22-24. We agree.

Here, the trial court properly considered the age when Appellant would be eligible for parole in order to determine that the new sentence was not the functional equivalent of a *de facto* sentence of life without the possibility of parole. Since Appellant will have a meaningful opportunity to obtain his release, we agree with the trial court's assessment that Appellant's sentence cannot be considered *de facto* life without the possibility of parole. As such,

we need not consider whether the trial court errantly omitted a finding of permanent incorrigibility.[4] Thus, Appellant's first claim is without merit.

In his second issue presented, Appellant relies principally upon ***Atkins v. Virginia***, 536 U.S. 304 (2002) wherein the United States Supreme Court declared it unconstitutional to impose the death penalty upon a person with intellectual disabilities. Citing ***Atkins***, Appellant observes, "the Supreme Court found that persons with [intellectual disabilities] have certain impairments that render them less morally culpable for their crimes," the penological goals of retribution and deterrence are not met by imposing a *de facto* life sentence on a person with intellectual disabilities, and, therefore, similar to the death penalty, a *de facto* life sentence for a person with intellectual disabilities should be held unconstitutional. **See** Appellant's Brief at 20-22. In the alternative, Appellant contends that *de facto* life sentences imposed for juveniles with intellectual disabilities be subject to "a higher level of scrutiny." ***Id.*** at 22.

Initially, we note that in his post-trial motion for reconsideration, Appellant argued generally that his sentence amounted to a *de facto* life sentence and that the trial court failed to consider his contention that his life-expectancy was diminished in light of his physical and mental health.

---

[4]    Regardless, the United States Supreme Court "has unequivocally stated that a separate factual finding of permanent incorrigibility is not required before a sentencer imposes a life-without-parole sentence on a murderer under 18." ***Jones***, 141 S. Ct. at 1318–1319.

Appellant also argued the trial court failed to consider his "adjustment to the prison environment without considering a less restrictive environment that could meet his medical and mental health needs and still protect the community[,]" as well as, "the debilitating characteristics of [his] youth and the nature of his mental and intellectual disabilities as a cause of the underlying crime." Motion for Reconsideration, 12/26/2019. In his counseled Rule 1925(b) statement, Appellant asserted: 1) his sentence amounted to a *de facto* life sentence considering his physical and mental health, and; 2) the trial court failed to consider his adjustment to prison when imposing his sentence.[5] *See* Rule 1925(b) Statement, 3/25/2020 ("The [trial c]ourt's sentence of 48 years to life constitutes *de facto* life without parole. [...The trial c]ourt placed undue weight on [Appellant's] adjustment to the prison environment and failed to consider a less restrictive environment that could meet his medical and mental health needs and still protect the community."). However, Appellant never argued that ***Atkins*** was applicable or that the trial court erred by failing to adhere to it. Generally, an appellant cannot present a new legal theory, and this Court cannot review a new issue, for the first time on appeal. *See Commonwealth v. Golson*, 189 A.3d 994, 1000 (Pa. Super.

_____

[5] On appeal, Appellant abandons his argument that the trial court failed to consider his adjustment to prison when imposing his sentence; thus, we find that issue waived. *See Commonwealth v. Perez*, 93 A.3d 829, 838 (Pa. 2014) (the failure to develop an appellate argument with citations to supporting authorities and the record is waived).

- 11 -

2018) ("Generally, an appellant cannot raise new legal theories for the first time on appeal."); **see also** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

Appellant, however, also contends that his newly imposed sentence is unconstitutional by extension under **Atkins**. Such claim would implicate the legality of sentence, which is subject to our *sua sponte* review. **See Commonwealth v. Coleman**, 226 A.3d 598, 602 (Pa. Super. 2020) ("A challenge to the legality of a particular sentence may be reviewed by any court on direct appeal; it need not be preserved in the lower courts to be reviewable and may even be raised by an appellate court *sua sponte*."). As stated above, the **Atkins** Court declared it unconstitutional to impose the death penalty upon a person with intellectual disabilities. Herein, Appellant did not receive the death penalty. Instead, Appellant urges this Court to extend the holding in **Atkins** and conclude that a *de facto* life sentence for a person with intellectual disabilities equates to a death sentence and should likewise be held unconstitutional. As explained at length above, however, we reject Appellant's contention that he received a *de facto* life sentence. Moreover, Appellant does not cite any legal authority (and our independent research has not revealed any) to support his suggestion that he was entitled to additional

judicial scrutiny because he suffered from mental disabilities.[6]  Simply put, Appellant has not shown how his sentence runs afoul of the United States Constitution or otherwise constitutes an illegal sentence for a person with

_____

[6] Additionally, appellate challenges to the legality of a sentence are examined under a *de novo* standard of review and a plenary scope of review.  Contrary to Appellant's generalized and unspecific claim, there is no "higher" standard of appellate review that can be undertaken.

mental disabilities.[7]    For all of the foregoing reasons, we will not consider

Appellant's second issue as presented.[8]

_____

[7]  The United States Supreme Court has held:

> [A]ny homicide, and particularly a homicide committed by an individual under 18, is a horrific tragedy for all involved and for all affected.  Determining the proper sentence in such a case raises profound questions of morality and social policy.  The States, not the federal courts, make those broad moral and policy judgments in the first instance when enacting their sentencing laws.  And state sentencing judges and juries then determine the proper sentence in individual cases in light of the facts and circumstances of the offense, and the background of the offender.

> Under [the United States Supreme Court's] precedents, [the United States Supreme] Court's more limited role is to safeguard the limits imposed by the Cruel and Unusual Punishments Clause of the Eighth Amendment. The Court's precedents require a discretionary sentencing procedure in a case [involving a juvenile homicide offender].  […R]esentencing [] complie[s] with those precedents [when] the sentence was not mandatory and the trial judge had discretion to impose a lesser punishment in light of [the offender's] youth. Moreover, [] [the Court] do[es] not consider [] any as-applied Eighth Amendment claim of disproportionality regarding Jones's sentence.

> Importantly, like **Miller** and **Montgomery**, [the Court's] holding today does not preclude the States from imposing additional sentencing limits in cases involving defendants under 18 convicted of murder. States may categorically prohibit life without parole for all offenders under 18.  Or States may require sentencers to make extra factual findings before sentencing an offender under 18 to life without parole.  Or States may direct sentencers to formally explain on the record why a life-without-parole sentence is appropriate notwithstanding the defendant's youth. States may also establish rigorous proportionality or other substantive appellate review of life-without-parole sentences.  All of those options, and others, remain available to the States.  Indeed, many States have recently adopted one or more of those reforms. But

*(Footnote Continued Next Page)*

Judgment of sentence affirmed.

Judgment Entered.

*[signature]*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/28/2021

_____

the U.S. Constitution, as [the Supreme] Court's precedents have interpreted it, does not demand those particular policy approaches.

***Jones***, 141 S. Ct. at 1322–1323 (internal citations omitted).

8   Appellant's second issue is essentially an extension of his first issue. Assuming Appellant's second claim was properly before us as a challenge to the discretionary aspects of his sentence alleging inadequate consideration of his intellectual disabilities, we would additionally note that a juvenile's mental health is already an established, statutory sentencing factor in determining the appropriate sentence for a juvenile homicide offender.  Section 1102.1(d) only states that mental health must be considered.  The statute, however, does not assign mental health more weight than the additional factors.  Upon review of the record, we conclude that the trial court complied with Section 1102.1(d).  Here, Appellant retained a mental health mitigation expert, paid by the Commonwealth, who provided the trial court with a mental health report prior to resentencing.  Prior to imposing sentence, the trial court noted that it had "reviewed all the psychiatric and psychological reports and [] testimony[.]"  N.T., 12/17/2019, at 4.  In its sentencing order, the trial court individually examined each of the Section 1102.1(d) factors in detail.  The trial court specifically considered Appellant's mental health and intellectual disabilities. ***See*** Sentencing Order, 12/17/2019, at 4-5; 9-10.  Thus, the trial court considered mental capacity at sentencing. ***See*** 18 Pa.C.S.A. § 1102.1(d) (Sentence of persons under the age of 18 for murder, murder of an unborn child and murder of a law enforcement).

- 15 -