**[J-53-2019]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 18 EAP 2018 |
| | : | |
| Appellee | : | Appeal from the Order of Superior |
| | : | Court entered on 12/20/2017 at No. |
| | : | 660 EDA 2015 affirming the |
| v. | : | Judgment of Sentence entered on |
| | : | 10/24/2014 in the Court of Common |
| | : | Pleas, Philadelphia County, Criminal |
| MICHAEL FELDER, | : | Division at No. CP-51-CR-0014896- |
| | : | 2009. |
| Appellant | : | |
| | : | ARGUED: September 11, 2019 |


## OPINION


**JUSTICE DOUGHERTY**[1]                                    **DECIDED: February 23, 2022**

Over the past two decades, in a series of Eighth Amendment cases applying the

Cruel and Unusual Punishments Clause,[2] the United States Supreme Court consistently

has held that sentencing an offender who was under eighteen years old at the time of the

crime raises special constitutional considerations. Of particular consequence in this line

of cases were *Miller v. Alabama*, 567 U.S. 460 (2012), which prohibited mandatory life

sentences for juvenile homicide offenders, and *Montgomery v. Louisiana*, 577 U.S. 190

(2016), which held *Miller* applied retroactively to cases on collateral appeal. In the wake

of these decisions, hundreds of defendants who committed murder as a juvenile and were

---

[1] This matter was reassigned to this author.

[2] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII.

imprisoned under Pennsylvania's former mandatory-life-without-parole sentencing scheme had to be resentenced.

For our part, in *Commonwealth v. Batts*, 163 A.3d 410 (Pa. 2017) ("*Batts II*"), we exercised "our constitutional power of judicial administration to devise a procedure for the implementation of the *Miller* and *Montgomery* decisions in Pennsylvania." *Id*. at 451 (internal quotations omitted). Among other things, we adopted a presumption against the imposition of a sentence of life without parole for juveniles and imposed on the Commonwealth the burden of proving, beyond a reasonable doubt, that a juvenile offender is incapable of rehabilitation. *See id*. at 459. We determined these procedures were necessary to effectuate what we believed then was the central mandate of *Miller* and *Montgomery*: that "for a life-without-parole sentence to be constitutionally valid, the sentencing court must find that the juvenile offender is permanently incorrigible and that rehabilitation would be impossible." *Id*. Still, even after establishing this comprehensive set of legal criteria to guide juvenile sentencings, other questions remained. We granted review in this case to consider one such issue: whether a discretionary term-of-years sentence may be so long as to amount to a *de facto* life sentence, thereby triggering the substantive and procedural protections afforded by *Miller* and its progeny.

Before we could resolve that issue, however, the High Court decided *Jones v. Mississippi*, ___ U.S. ___, 141 S.Ct. 1307 (2021), which severely narrowed the holdings of *Miller* and *Montgomery* as previously understood by many courts, including this one. Upon careful review of this new guidance, we are constrained to conclude our decision in *Batts II* has largely been abrogated. We further conclude *Jones* is dispositive of the issue presented here. As we will explain below, pursuant to the reasoning in *Jones*, even if a term-of-years sentence amounts to a *de facto* life sentence, *Miller* provides no viable avenue for relief. Accordingly, we affirm appellant's judgment of sentence.

## I. Relevant Precedent

Before discussing the facts, we start with a review of the relevant precedent. In 2005, the United States Supreme Court began to place various constitutional limits on sentencing juveniles who had been convicted of serious criminal offenses.[3] First, in *Roper v. Simmons*, 543 U.S. 551, 578 (2005), it concluded the Eighth Amendment forbids capital punishment for murderers who were under eighteen at the time of their crimes. Next, in *Graham v. Florida*, 560 U.S. 48, 82 (2010), the Court held the Eighth Amendment prohibits life without parole for juvenile offenders who did not commit homicide. Then in *Miller* in 2012, the Court barred mandatory sentencing schemes for juveniles convicted of homicide, concluding such sentences violate the principle of proportionality inherent to the Eighth Amendment. *Miller*, 567 U.S. at 489.[4] Four years later, in *Montgomery*, the Court held *Miller* announced a substantive rule of constitutional law that applies retroactively to cases on collateral review. *Montgomery*, 577 U.S. at 212.

Our opinion in *Batts II* came on the heels of these decisions and the General Assembly's enactment of a new sentencing statute for juveniles convicted of first- and second-degree murder after June 24, 2012 — the day before *Miller* was decided. *See* 18

---

[3] Much of the High Court's Eighth Amendment jurisprudence concerning juveniles is well-trodden territory for this Court, *see Batts II*, 163 A.3d at 431-41, so a brief summary will suffice to lay the necessary foundation.

[4] In *Commonwealth v. Batts*, 66 A.3d 286 (Pa. 2013) ("*Batts I*"), our first post-*Miller* decision addressing the sentencing of juvenile homicide offenders, we rejected the argument that juveniles can never be sentenced to life without parole, noting that *Miller* itself did not require such a broad proscription. *See id.* at 296. Instead, we explained *Miller* requires only "that there be judicial consideration of the appropriate age-related factors set forth in that decision prior to the imposition of a sentence of life imprisonment without the possibility of parole on a juvenile." *Id.* We also found nothing to suggest "that Pennsylvania's history favors a broader proportionality rule than what is required by the United States Supreme Court." *Id.* at 299.

Pa.C.S. §1102.1(a), (c).[5] We began our analysis by addressing the appropriate level of scrutiny for appellate review of a non-mandatory sentence of life without parole imposed upon a juvenile. *See Batts II*, 163 A.3d at 434. This was critical, we explained, because the distinction between a claim challenging the discretionary aspects of a sentence, as opposed to its legality, "also encompasses matters of issue preservation, this Court's jurisdiction to decide the question presented, and the level of deference the reviewing court must give to the decision of the sentencing court." *Id.* Ultimately, after conducting an extensive review of the High Court's Eighth Amendment precedent, we resolved that "in the absence of the sentencing court reaching a conclusion . . . that the defendant will forever be incorrigible, without any hope for rehabilitation, a life-without-parole sentence imposed on a juvenile is illegal, as it is beyond the court's power to impose." *Id*. at 435. In other words, we interpreted the High Court's decisions in *Miller* and *Montgomery* as "permit[ting] the imposition of a life-without parole sentence upon a juvenile offender **only** if the crime committed is indicative of the offender's permanent incorrigibility; that the crime was not the result of the unfortunate yet transient immaturity endemic of all juveniles." *Id*. (internal quotations and citations omitted; emphasis in original); *see also id*. ("[F]or a sentence of life without parole to be proportional as applied to a juvenile murderer, the sentencing court must first find, based on competent evidence, that the offender is entirely unable to change.").

We reiterated this understanding when we proceeded to consider the legality of Batts's sentence *de novo*, and held it was illegal. Initially, we recognized there was "no question that the sentencing court thoroughly and completely reviewed the record and thoughtfully considered the testimony presented at the resentencing hearing" before

---

[5] We observed in *Batts II* that "the General Assembly has not passed a statute addressing the sentencing of juveniles convicted of first-[ or second-]degree murder pre-*Miller*[.]" *Batts II*, 163 A.3d at 445. This remains true today.

imposing a discretionary life-without-parole sentence. *Id.* at 437 (footnote omitted); *see also id.* at 424 (noting sentencing court "took into account the general factors in [S]ection 9721(b) of the Sentencing Code, the *Miller* factors and the factors identified in 18 Pa.C.S. §1102.1(d)") (footnote omitted).[6] Nevertheless, we held this was not enough to withstand

---

[6] Section 9721(b) of the Sentencing Code requires courts to adhere to

> the general principle that the sentence imposed should call for total confinement that is consistent with section 9725 (relating to total confinement) and the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant. The court shall also consider any guidelines for sentencing and resentencing adopted by the Pennsylvania Commission on Sentencing and taking effect under section 2155[.]

42 Pa.C.S. §9721(b). As for the *Miller* factors, we have identified those as

> a juvenile's age at the time of the offense, his diminished culpability and capacity for change, the circumstances of the crime, the extent of his participation in the crime, his family, home and neighborhood environment, his emotional maturity and development, the extent that familial and/or peer pressure may have affected him, his past exposure to violence, his drug and alcohol history, his ability to deal with the police, his capacity to assist his attorney, his mental health history, and his potential for rehabilitation.

*Batts I*, 66 A.3d at 297 (internal quotations and citation omitted). Lastly, Section 1102.1(d) mandates that

> [i]n determining whether to impose a sentence of life without parole under subsection (a), the court shall consider and make findings on the record regarding the following:
>
> (1) The impact of the offense on each victim, including oral and written victim impact statements made or submitted by family members of the victim detailing the physical, psychological and economic effects of the crime on the victim and the victim's family. A victim impact statement may include comment on the sentence of the defendant.
>
> (2) The impact of the offense on the community.
>
> (3) The threat to the safety of the public or any individual posed by the defendant.

constitutional scrutiny.  In our judgment, the sentencing court had "overlooked the main premise" of the High Court's juvenile sentencing jurisprudence and impermissibly overrode its repeated admonitions "that juvenile first-degree murderers are presumptively less culpable than their adult counterparts and, as such, should be sentenced differently." *Id.* at 437.  Thus, notwithstanding the court's finding that Batts's crime was not the result of unfortunate yet transient immaturity, because the court also opined that "there remained a possibility that Batts could be rehabilitated[,]" we held a sentence of life in

---

(4) The nature and circumstances of the offense committed by the defendant.

(5) The degree of the defendant's culpability.

(6) Guidelines for sentencing and resentencing adopted by the Pennsylvania Commission on Sentencing.

(7) Age-related characteristics of the defendant, including:

  (i) Age.

  (ii) Mental capacity.

  (iii) Maturity.

  (iv) The degree of criminal sophistication exhibited by the defendant.

  (v) The nature and extent of any prior delinquent or criminal history, including the success or failure of any previous attempts by the court to rehabilitate the defendant.

  (vi) Probation or institutional reports.

  (vii) Other relevant factors.

18 Pa.C.S. §1102.1(d).  As we have previously remarked, Section 1102.1(d) requires sentencing courts to consider some, though not all, of the *Miller* factors.  *See Batts II*, 163 A.3d at 455 n.23.

prison without the possibility of parole was illegally "disproportionate under *Miller* and *Montgomery*[.]"  *Batts II*, 163 A.3d at 436, 439.

Our task in *Batts II* did not end there.  We also recognized that "[d]espite the sentencing court's best efforts . . ., the lack of procedural safeguards resulted in it failing to properly apply the law to Batts'[s] resentencing."  *Id.* at 451.  Moreover, we observed that, at that time, there remained several hundred individuals in Pennsylvania prisons serving what we then believed were illegal life-without-parole sentences awaiting resentencing.  *See id.* at 450.  For those reasons, and because "[t]he General Assembly has not taken any appreciable steps to create a separate sentencing statute or to revise existing law so that it applies to juveniles convicted of first-[ or second-]degree murder prior to *Miller*[,]" we determined an "exercise of our constitutional authority [wa]s required to set forth the manner in which resentencing will proceed in the courts of this Commonwealth."  *Id.* at 450-51.  And since we sought to devise only a procedural framework for implementing *Miller* and *Montgomery*'s substantive mandate, we reasoned that such power "falls squarely within our constitutional authority."  *Id.* at 449; *see* PA. CONST. art. V, §10(c) ("The Supreme Court shall have the power to prescribe general rules governing practice, procedure and the conduct of all courts . . . if such rules . . . neither abridge, enlarge nor modify the substantive rights of any litigant.").

Pursuant to that power we approved a medley of protective procedural measures advanced by Batts and his *amici*.  First, we determined "a faithful application of the holding in *Miller*, as clarified in *Montgomery*, requires the creation of a presumption against sentencing a juvenile offender to life in prison without the possibility of parole."  *Id.* at 452.  Second, based on "the definitive language used by" the High Court's precedents, we concluded "that to overcome the presumption against the imposition of a sentence of life without parole for a juvenile offender, the Commonwealth must prove that the juvenile is

constitutionally eligible for the sentence beyond a reasonable doubt." *Id.* at 455. Third, "[c]onsistent with the requirements of due process and [S]ection 1102.1(b)," we held that where the Commonwealth seeks to have the sentencing court impose a sentence of life without parole on a juvenile offender, "it must provide reasonable notice to the defendant prior to the sentencing hearing." *Id.* We anticipated that "the proper employment of these procedures w[ould] result in courts sentencing juveniles to life without parole in only the rarest of circumstances, as contemplated and prescribed by the United States Supreme Court." *Id.* at 457; *see id.* (expressing our intention to "curtail the imposition of illegal sentences of life without parole by sentencing courts").[7]

Even after *Batts II*, certain issues remained unresolved. We confronted one of those issues in *Commonwealth v. Machicote*, 206 A.3d 1110 (Pa. 2019). There, we held "that when a juvenile is exposed to a potential sentence of life without the possibility of parole the [sentencing] court must consider the *Miller* factors, on the record, prior to imposing a sentence." *Id.* at 1120. Failure to do so, we explained, renders the resulting sentence illegal — even in cases like Machicote's, where the defendant was not actually sentenced to life without parole. *See id.*

---

[7] Several other procedural protections were also considered in *Batts II*. Notably, we rejected Batts's claim that expert testimony is constitutionally required in this context; disagreed that a jury must make the finding regarding a juvenile's eligibility to be sentenced to life without parole; and declined to permit appeals from the imposition of a sentence of life without parole to be taken directly to this Court. *See Batts II*, 163 A.3d at 455-57. But we did find it prudent to advise sentencing courts to "examine both the *Miller* factors and the [S]ection 1102.1(d) factors" in all cases, "regardless of whether the juvenile was convicted pre- or post-*Miller*." *Id.* at 455 n.23. Unlike with the other criteria discussed above, though, this directive did "not result from a review of the constitutionality of the statute." *Id.* at 458 n.25. Rather, it was based on "the policy determination and legislative intent embodied in [S]ection 1102.1 and the goal of uniformity in sentencing." *Id.* Importantly, we discerned "no impediment . . . to our instructing sentencing courts to use the new legislative provision as guidance without making it mandatory." *Id.*

Other gaps in the juvenile homicide offender sentencing framework have been filled by the Superior Court. For example, that court has extended aspects of our decision in *Batts II* to address situations that were not directly at issue in that case *See, e.g.*, *Commonwealth v. Olds*, 192 A.3d 1188, 1197 (Pa. Super. 2018) (employing reasoning from *Batts II*, a first-degree murder case, to "hold that the Eighth Amendment permits imposition of [S]ection 1102(b)'s mandatory maximum term of life imprisonment for juveniles convicted of second-degree murder"); *accord Commonwealth v. Sesky*, 170 A.3d 1105, 1105-06 (Pa. Super. 2017). In other cases, the intermediate court has partially restricted our holdings in *Batts II* and *Machicote*. *See, e.g.*, *Commonwealth v. Lekka*, 210 A.3d 343, 357 (Pa. Super. 2019) (distinguishing *Machicote* and finding no error in failure to consider *Miller* factors where the Commonwealth "did not seek, and the sentencing court did not impose, a life-without-parole sentence"); *Commonwealth v. White*, 193 A.3d 977, 983 (Pa. Super. 2018) (*Miller* factors must be considered "only in cases where the Commonwealth is attempting to meet its burden of overcoming the presumption against juvenile [life-without-parole] sentences").

Most relevant here, the Superior Court also has been at the forefront of addressing a wave of so-called *de facto* life sentence claims.[8] In 2018, a three-judge panel held as a matter of first impression that "a trial court may not impose a term-of-years sentence on a juvenile convicted of homicide if that term-of-years sentence equates to a *de facto* [life-without-parole] sentence unless it finds, beyond a reasonable doubt, that the juvenile is incapable of rehabilitation." *Foust*, 180 A.3d 433. Although the panel "decline[d] to draw a bright line . . . delineating what constitutes a *de facto* [life-without-parole] sentence and

_____

[8] Some courts define a *de facto* life sentence as "one that exceeds the defendant's life expectancy." *Adams v. State*, 188 So.3d 849, 851 (Fla. Dist. Ct. App. 2012). Generally speaking, we have no trouble concluding "[t]here are certain term-of-years sentences which clearly constitute *de facto*" life sentences — for instance, "a 150-year sentence." *Commonwealth v. Foust*, 180 A.3d 416, 438 (Pa. Super. 2018).

what constitutes a constitutional term-of-years sentence[,]" it held the inquiry must be informed by "consider[ing] the sentence for each individual crime separately and not [in] the aggregate[.]" *Id*. at 438, 441. Not long after, a different panel determined the "key factor in considering the upper limit of what constitutes a constitutional sentence" is "whether there is 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" *Commonwealth v. Bebout*, 186 A.3d 462, 468 (Pa. Super. 2018), *quoting Graham*, 560 U.S. at 75. Using that standard, the Superior Court has approved a range of lengthy term-of-years sentences as constitutional. *See, e.g.*, *Commonwealth v. Anderson*, 224 A.3d 40, 47 (Pa. Super. 2019) (50 years to life); *White*, 193 A.3d at 986 (35 years to life); *Bebout*, 186 A.3d at 469-70 (45 years to life); *Foust*, 180 A.3d at 438 (60 years to life, aggregated from two 30-years-to-life sentences).

## II. Facts & Procedural History

Having set forth the legal context in which the present appeal arose, we now return to the facts and procedural history. One summer day in 2009, when he was seventeen-and-a-half years old, appellant was playing in a pick-up basketball game with Andrew Williams at an outdoor court in Philadelphia. The pair were matched against brothers Jarrett and Malcolm Green. Shortly into the game, appellant's style of play became aggressive. Eventually, an argument ensued after Williams refused to hand the ball over to the Greens. Appellant walked to the sideline and removed a .380 semiautomatic handgun from his gym bag. He then shot Malcolm in the head before shooting Jarrett in the stomach and leg. Only Malcolm survived.

In 2012, a jury convicted appellant of first-degree murder and aggravated assault for his role in shooting the Greens. Pursuant to the then-applicable mandatory sentence for first-degree murder, which also applied to juveniles, appellant was sentenced to life

imprisonment without the possibility of parole. *See* 18 Pa.C.S. §1102(a)(1) (superseded as applied to juveniles by 18 Pa.C.S. §1102.1).

The Superior Court vacated appellant's judgment of sentence two years later. By that time, both *Miller* and *Batts I* had been decided. And since appellant's judgment of sentence was not yet final, the Superior Court determined he was entitled to the benefit of those rulings and to consideration of the *Miller* factors before being resentenced, and remanded the case for such proceedings. *See Commonwealth v. Felder*, 2148 EDA 2012, 2014 WL 10919377 (Pa. Super. June 27, 2014) (unpublished memorandum).

On October 24, 2014, the trial court held a second sentencing hearing. Appellant asserted the murder was an impulsive act that was the product of his undeveloped juvenile brain. He maintained that, because his brain was still developing at the time, he presented a greater opportunity for rehabilitation than would an adult who committed the same crime. Appellant offered evidence to demonstrate he already had used prison as an opportunity to rehabilitate and to better himself. For example, while incarcerated, appellant obtained his high school diploma and participated in therapeutic sessions with a violence prevention counselor. He also submitted testimony from his mother and a letter from his cousin.

The court considered the record — including, *inter alia*, presentence memoranda, psychological reports, victim impact statements, and school records — as well as the parties' arguments and evidentiary presentations, and the court's own "very lengthy contemporaneous notes taken during both the trial of this case and during the initial sentencing proceeding." Notes of Testimony ("N.T."), 10/24/2014, at 51. The court also contemplated, "on the record, every one of the twelve factors for a [c]ourt to consider before sentencing a juvenile for first-degree murder as enumerated in *Miller* and *Batts* [*I.*]" Sentencing Court Op., 2/18/2016, at 5; *accord* N.T. 10/24/2014 at 51-52. Based on that

wide-ranging review, the court found the facts and circumstances of appellant's crime necessitated a lengthy sentence. *See* N.T. 10/24/2014 at 53-54 (noting there were two victims and additional crimes charged; "to not take those facts into consideration now would be to denigrate the serious nature of the crimes [appellant] committed against both victims"). Accordingly, the court imposed a discretionary 50-years-to-life sentence for appellant's first-degree murder conviction.

On appeal to the Superior Court, appellant challenged the legality of his sentence, arguing "a 50-year minimum sentence is a *de facto* life sentence." *Commonwealth v. Felder*, 660 EDA 2015, 2017 WL 6505643 at *2 (Pa. Super. Dec. 20, 2017) (unpublished memorandum).[9] The panel found appellant's support for that position to be lacking. First, although appellant portrayed a 2012 United States Sentencing Commission Preliminary Quarterly Data Report as demonstrating that 470 months is considered a life sentence for purposes of federal law, the panel reviewed the same report and concluded the figure was nothing more than a nonbinding "statistic out of context." *Id.* at *3.[10] Similarly, after looking to cases from other states that have addressed this issue, the panel lamented

---

[9] Appellant additionally asserted *Miller* invalidated Pennsylvania's first-degree murder sentencing scheme, meaning he could be sentenced pursuant to the third-degree murder statute only. Although this Court had previously rejected that precise claim, *see Batts I*, 66 A.3d at 293-96, appellant argued it should be considered anew in light of *Montgomery*. The Superior Court declined appellant's invitation to reconsider the issue, finding he had failed to support the contention with substantive analysis or discussion. *See Felder*, 2017 WL 6505643 at *5.

[10] Other Superior Court panels have likewise struggled to determine what constitutional significance, if any, these types of statistics may hold in the analysis. *See, e.g., Bebout*, 186 A.3d at 469 (remarking "it is not at all discernable which statistics [courts] can rely on to predict life expectancy in specific cases" and expressing concern that the use of such data to govern *de facto* life sentence claims would "create a myriad of new questions without any easy answers, sending us down a constantly evolving rabbit hole from which we may never escape as more and more data arrives").

that it uncovered no "clear resolution," only "great disparity in approach and interpretation of the dictates of *Miller* . . . demonstrat[ing] the difficulty of the problem." *Id.*

In the absence of clear binding authority, the panel returned to the core holding of *Miller*, which prohibited only those sentencing schemes that prescribe mandatory life sentences without parole. The panel explained that, on its face, *Miller* "does not directly apply" to appellant's claim, *i.e.*, a challenge to a lengthy, but discretionary, term-of-years sentence. *Id.* at *4; *see also id.* ("*Miller* did not address a situation . . . wherein a juvenile defendant was given a significant sentence upon the discretion of the trial court"); *id.* ("*Miller* takes no stand on claims of *de facto* life sentences"). It therefore concluded "that when a juvenile convicted of homicide has been subjected to a discretionary sentence that may approach, but does not clearly exceed life expectancy, that sentence does not run afoul of *Miller*." *Id.* Applying that rule to appellant's case, the panel detected no Eighth Amendment problem with his sentence. Although the 50-year minimum term may appear "significant" since it precludes appellant from seeking parole until he is 68 years old, the panel nevertheless found it constitutional because it "was the result of an individualized and discretionary sentencing hearing[.]" *Id.*

Appellant sought allowance of appeal in this Court, and we granted discretionary review limited to a single question:

> Does not a sentence of 50 years to life imposed upon a juvenile constitute a *de facto* life sentence requiring the sentencing court, as mandated by this Court in *Commonwealth v. Batts*, 163 A.3d 410 (Pa. 2017) ("*Batts II*"), [to] first find permanent incorrigibility, irreparable corruption or irretrievable depravity beyond a reasonable doubt.

*Commonwealth v. Felder*, 187 A.3d 909 (Pa. 2018) (*per curiam*). This issue presents a question of law over which we exercise a *de novo* standard and plenary scope of review. *Batts II*, 163 A.3d at 435.

### III. Analysis

After the parties briefed and argued the issue upon which we granted review, the Supreme Court decided *Jones.* Because our review of that decision leads us to conclude it is dispositive here, we dispense with our usual practice of recounting the parties' arguments and proceed directly to our analysis.[11]

For the last few years, there has been widespread "disagreement in state and federal courts about how to interpret *Miller* and *Montgomery*[.]" *Jones*, 141 S.Ct. at 1313; *Batts II*, 163 A.3d at 458 n.26 (discussing different approaches). To create clarity and resolve the split, the Court granted *certiorari* in *Jones* to consider whether a sentencer who imposes a life-without-parole sentence must make a separate factual finding of permanent incorrigibility, or at least provide an on-the-record sentencing explanation with an implicit finding of permanent incorrigibility. *See Jones*, 141 S.Ct. at 1313. Upon its review, the *Jones* Court concluded that "*Miller and Montgomery* squarely rejected such a requirement." *Id.* at 1314.

Taking *Miller* first, the *Jones* Court clarified that it "mandated 'only that a sentencer follow a certain process — considering an offender's youth and attendant characteristics — before imposing' a life-without-parole sentence." *Id.* at 1314, *quoting Miller*, 567 U.S. at 483. According to the Court, such a discretionary "procedure ensures that the sentencer affords individual consideration to, among other things, the defendant's chronological age and its hallmark features." *Id.* at 1316 (internal quotations and citation

---

[11] After *Jones* was decided, we directed the parties to address "its impact on the issue presented in this appeal." Order, 6/22/2021. In his response, appellant argues *Jones* "has no impact on Pennsylvania law" and maintains that "the sentencing procedures this Court set up in *Batts II* remain fully intact[.]" Appellant's Supplemental Brief at 1, 5. The Commonwealth, represented by the Philadelphia District Attorney's Office, adopts the same position. *See* Appellee's Supplemental Brief at 4 (asserting *Jones* "is not material to the question before this Court"); *see id.* at 5 (suggesting the "procedures this Court adopted in *Batts II* were not compelled by the Eighth Amendment").

omitted); *see id.* (stating non-mandatory sentencing schemes permit sentencers to "consider the murderer's diminished culpability and heightened capacity for change") (internal quotations and citation omitted). In support of this reading of *Miller*, the *Jones* Court found it significant that *Miller* "repeatedly described youth as a sentencing factor akin to a mitigating circumstance." *Id.* at 1315. This characterization, the *Jones* Court reasoned, reflects the fact that "permanent incorrigibility is not an eligibility criterion akin to sanity or lack of intellectual disability." *Id.* Rather, *Miller* merely "followed the Court's many death penalty cases and required that a sentencer consider youth as a mitigating factor when deciding whether to impose a life-without-parole sentence," but it "did not require the sentencer to make a separate finding of permanent incorrigibility before imposing such a sentence." *Id.* at 1316; *see id.* ("*Miller* cited *Roper* and *Graham* for a simple proposition: Youth matters in sentencing. And because youth matters, *Miller* held that a sentencer must have discretion to consider youth before imposing a life-without-parole sentence[.]").

As for *Montgomery*, the *Jones* Court bluntly declared that it "did not purport to add to *Miller*'s requirements." *Id.* To bolster this position, the Court noted it granted *certiorari* in *Montgomery* "not to consider whether the rule announced in *Miller* should be expanded, but rather simply to decide whether *Miller*'s holding is retroactive to juvenile offenders whose convictions and sentences were final when *Miller* was decided." *Id.* at 1317 (internal quotations and citation omitted). Thus, the Court found unpersuasive Jones's reliance "on language in *Montgomery* that described *Miller* as permitting life-without parole sentences only for those whose crimes reflect permanent incorrigibility, rather than transient immaturity." *Id.* (internal quotations omitted). Moreover, the Court emphasized that *Montgomery* "flatly stated that '*Miller* did not impose a formal factfinding requirement'

and that 'a finding of fact regarding a child's incorrigibility . . . is not required.'" *Id*. at 1314-15, *quoting Montgomery*, 577 U.S. at 211.

We distill the following holdings from *Jones*. First, "a separate factual finding of permanent incorrigibility is not required before a sentencer imposes a life-without-parole sentence on a murderer under 18." *Id*. at 1318-19. Second, "an on-the-record sentencing explanation . . . is not required by or consistent with *Miller*." *Id*. at 1320. Although "States may require sentencers to make extra factual findings before sentencing an offender under 18 to life without parole" or "direct sentencers to formally explain on the record why a life-without-parole sentence is appropriate notwithstanding the defendant's youth[,]" the federal constitution "does not demand those particular policy approaches." *Id*. at 1323. In short, "[i]n a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary **and constitutionally sufficient**." *Id*. at 1313 (emphasis added).[12]

---

[12] In a blistering dissent joined by Justices Breyer and Kagan, Justice Sotomayor forcefully argued the *Jones* Court was retreating from *Montgomery*'s reading of *Miller*. *See Jones*, 141 S.Ct. at 1328 (Sotomayor, J., dissenting) (asserting the decision "guts" *Montgomery*'s interpretation of *Miller* and "reduces *Miller* to a decision requiring just a discretionary sentencing procedure where youth [is] considered") (internal quotations and citation omitted). In fact, Justice Sotomayor pointed to *Batts II* and implied that this Court, unlike the *Jones* majority, had properly recognized *Miller* "requires far more than mere consideration of an offender's age[.]'" *Id*. at 1334, *quoting Batts II*, 163 A.3d at 433. In any event, because the *Jones* majority expressly declared its decision "does not overrule *Miller* or *Montgomery*[,]" Justice Sotomayor urged courts "to continue applying those decisions faithfully." *Id*. at 1337 (internal quotations and citation omitted).

Justice Thomas authored a concurring opinion which principally took aim at the Court's treatment of *Montgomery*. He argued that "[r]ather than accept what was plainly the case — that *Miller* was procedural, not watershed, and thus not retroactive — *Montgomery* proceeded to 'rewrite' it into a substantive rule." *Id*. at 1325 (Thomas, J., concurring) (internal quotations and citation omitted). This supposed error, in Justice Thomas's view, forced the *Jones* majority to "labor[ ] mightily to avoid confronting the tension between *Miller* and *Montgomery*[.]" *Id*. at 1328. In this regard, the *Jones* majority held that, to the extent *Montgomery* "is in tension with the Court's retroactivity precedents that both pre-date and post-date *Montgomery*, those retroactivity precedents — and not *Montgomery*

Before considering how *Jones* impacts the issue presented, we revisit our decision in *Batts II*. In that case we found it necessary to adopt a number of procedural protections for purposes of sentencing juvenile murderers. We did so "to effectuate the mandate of *Miller* and *Montgomery*[.]" *Batts II*, 163 A.3d at 415. But *Jones* has fundamentally altered our understanding of those cases. The entire procedural framework we devised in *Batts II* was built on our assumption that "for a life-without-parole sentence to be constitutionally valid, the sentencing court must find that the juvenile offender is permanently incorrigible and that rehabilitation would be impossible." *Id.* at 459. Yet, *Jones* unequivocally dictates that a "finding of permanent incorrigibility is not required before a sentencer imposes a life-without-parole sentence on a murderer under 18." *Jones*, 141 S.Ct. at 1318-19. In the face of this conflict, it's no contest: "this Court is bound by the determinations of the United States Supreme Court on issues of federal law, including the construction and interpretation of the federal constitution." *Hall v. Pennsylvania Bd. of Prob. & Parole*, 851 A.2d 859, 863 (Pa. 2004) (citations omitted).

To reiterate, under the current state of Eighth Amendment law as expressed by *Jones*, "a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." *Jones*, 141 S.Ct. at 1313. A life-without-parole sentence for a juvenile murderer is thus constitutional, and hence no viable *Miller* claim exists, "so long as the sentence is not mandatory — that is, [ ] so long as the sentencer has discretion to consider the mitigating qualities of youth and impose a lesser punishment." *Id.* at 1314 (internal quotations and citations omitted). In *Batts II*, we interpreted *Montgomery* as "clarif[ying] that *Miller* requires far more than mere consideration of an offender's age prior

_____

— must guide the determination of whether rules other than *Miller* are substantive." *Id.* at 1317 n.4. Justice Thomas took this statement to mean the Court was effectively overruling *Montgomery* "in substance but not in name." *Id.* at 1327; *see id.* (contending *Montgomery* "gave a good-for-one-ride ticket to a class of juvenile offenders, and its errors will never be repeated").

to imposing a life-without-parole sentence[.]" *Batts II*, 163 A.3d at 433. This interpretation led us to hold that "for a sentence of life without parole to be proportional as applied to a juvenile murderer, the sentencing court must first find . . . that the offender is entirely unable to change." *Id.* at 435; *see also id.* (expressing belief that "[t]he United States Supreme Court decisions that control in this matter unambiguously permit the imposition of a life-without-parole sentence upon a juvenile offender **only** if the crime committed is indicative of the offender's permanent incorrigibility") (emphasis in original). Our understanding in this regard, however, has been abrogated by the High Court's decision in *Jones*.[13]

Moreover, we are constrained to conclude that without a substantive constitutional mooring, the procedural protections we adopted in *Batts II* cannot stand in their current, judicially-created form. As we have observed, "the Pennsylvania Constitution clearly and unambiguously bestows upon this Court 'the power to prescribe general rules governing practice, procedure and the conduct of all courts[,]'" but only if "such rules 'neither abridge, enlarge nor modify the substantive rights of any litigant[.]'" *Id.* at 449, *quoting* PA. CONST. art. V, §10(c). The procedural protections we embraced in *Batts II* — more specifically, a presumption against life-without-parole sentences and a requirement that to overcome this presumption the Commonwealth bears the burden of proving the impossibility of rehabilitation beyond a reasonable doubt — were not intended to enlarge any substantive rights of juvenile homicide offenders. Instead, we repeatedly stressed throughout our opinion that we believed those protections were constitutionally necessary "to effectuate the mandate of *Miller* and *Montgomery*" by "ensur[ing] that life-without-parole sentences are meted out only to the rarest of juvenile offenders whose crimes reflect permanent

---

[13] The same is true of our decision in *Machicote*, wherein we held that sentencing courts are "required to make a record of the *Miller* factors at sentencing." *Machicote*, 206 A.3d at 1120.

incorrigibility, irreparable corruption and irretrievable depravity." *Id.* at 415-16 (internal quotations and citations omitted); *see id.* at 452 ("a faithful application of the holding in *Miller*, as clarified in *Montgomery*, requires the creation of a presumption against sentencing a juvenile offender to life in prison without the possibility of parole"); *id.* at 455 ("Pursuant to . . . the definitive language used by the Supreme Court, we conclude that to overcome the presumption against the imposition of a sentence of life without parole for a juvenile offender, the Commonwealth must prove that the juvenile is constitutionally eligible for the sentence beyond a reasonable doubt."). However, *Jones* now instructs that, for purposes of the Eighth Amendment, "a State's discretionary sentencing system is . . . constitutionally sufficient." *Jones*, 141 S.Ct. at 1313.

We are thus forced to conclude the sentencing procedures we adopted in *Batts II* "do not carry the protections of the Eighth Amendment[.]" *Commonwealth v. DeJesus*, ___ A.3d ___, 2021 WL 4889071 at *3 (Pa. Super. 2021) (*en banc*). And absent some constitutional impetus, those procedures are no longer the product of a proper exercise of this Court's authority over judicial administration, because they enlarge the substantive rights of juvenile homicide offenders beyond what *Miller*, as cabined by *Jones*, requires. *Cf.* PA. CONST. art. V, §10(c). Consequently, we are left with no choice but to dissolve those procedural requirements in *Batts II* that are not constitutionally required — namely, the presumption against sentencing a juvenile homicide offender to life without parole, and the imposition on the Commonwealth of the burden of proving beyond a reasonable doubt that the juvenile is permanently incorrigible.[14] Moving forward, the authority of a

---

[14] The dissent, apparently believing we granted review to decide the "point at which [a term-of-years] sentence converts into the functional equivalent of a life sentence[,]" Dissenting Opinion at 4, charges us with going "beyond the issues presented for review[.]" *Id.* at 8. Respectfully, the dissent's premise is faulty. The question we actually agreed to consider, as phrased by appellant, is whether "a sentence of 50 years to life imposed upon a juvenile constitute[s] a *de facto* life sentence **requiring the sentencing court, as**

sentencing court to impose a life-without-parole sentence on a juvenile homicide offender is circumscribed only to the extent set forth in 42 Pa.C.S. §9721(b) and 18 Pa.C.S.

---

**mandated by this Court in [*Batts II*, to] first find permanent incorrigibility, irreparable corruption or irretrievable depravity beyond a reasonable doubt**.” *Felder*, 187 A.3d 909 (emphasis added). As appellant’s claim is expressly tethered to our decision in *Batts II*, the dissent’s argument we have improperly “inject[ed] consideration of [that] case” into our analysis, is untenable. Dissenting Opinion at 8-9.

In the alternative, the dissent says we should discontinue this case on the basis that “the analysis is not substantially prompted, or supported, by the parties’ arguments.” Dissenting Opinion at 6. Although the dissent acknowledges we afforded the parties an opportunity to file supplemental briefs addressing *Jones*, it implies this was insufficient “because our mandate to the parties for additional briefing did not mention *Batts II*[.]” *Id.* at 7. Again, this argument lacks any purchase since it is based on the dissent’s truncated reading of the issue before us. Appellant baked consideration of *Batts II* directly into the question presented, and our supplemental briefing order instructed the parties to brief *Jones*’s “impact on the issue presented[.]” Order, 6/22/2021. Thus, the implication we are somehow acting unilaterally or without input from the parties, is not well taken.

At bottom, the issue we must decide, as framed by appellant, is whether he is entitled to relief under *Batts II*. Answering that question necessarily requires us to re-evaluate *Batts II* under *Jones*, which, the dissent concedes, “changed everything.” Dissenting Opinion at 5. That the parties have refused to provide us with a fair appraisal of the High Court’s intervening, binding decision is not a proper reason to dismiss the appeal. *Cf. generally Commonwealth v. Brown*, 196 A.3d 130, 149 (Pa. 2018) (“[I]f the ‘power’ of a court amounts to nothing more than the power to do exactly what the parties tell it to do, simply because they said so and without any actual merits review, it is not judicial power at all. It is a **restriction** on power.”) (internal quotations and citation omitted; emphasis in original). Nor does the dissent’s assertion of mootness warrant dismissal. Even if we agreed with that characterization (we do not), this case would almost surely qualify for an exception. *See, e.g.*, *Pap’s A.M. v. City of Erie*, 812 A.2d 591, 600-01 (Pa. 2002) (alluding to the great-public-importance exception to the mootness doctrine, particularly in the face of a material lack of clarity in governing law). We crafted *Batts II*, so the responsibility naturally falls to us to clarify its viability following new governing federal law — and to do so with haste. Contrary to the dissent’s protestations, we respectfully believe the present case is a proper vehicle for providing that clarification.

§1102.1, and by *Miller*'s command to "consider the mitigating qualities of youth." *Miller*, 567 U.S. at 476 (internal quotations and citation omitted).[15]

We turn, finally, to the purported *de facto* life sentence before us, and we again find that *Jones* controls. To put it simply, even if a 50-years-to-life sentence amounts to a *de facto* life sentence, "there is no *Miller* problem here." *United States v. Grant*, 9 F.4th 186, 197 (3rd Cir. 2021) (*en banc*). This is because *Miller*'s bar on mandatory life-without-parole sentencing regimes "is a prophylactic that entitles a juvenile homicide offender to a certain sentencing process, but not a particular sentencing outcome[.]" *Id.* at 193. Indeed, permanent incorrigibility is "not an eligibility criterion akin to sanity or a lack of intellectual disability[,]" rather it is "a sentencing factor akin to a mitigating circumstance." *Jones*, 141 S.Ct. at 1315. For that reason, *Miller* "mandated only that a sentencer follow a certain process — considering an offender's youth and attendant characteristics — before imposing a life-without-parole sentence." *Id.* at 1311 (internal quotations and citations omitted); *see also Grant*, 9 F.4th at 200 ("What matters for *Miller* purposes is whether the sentencer considered a juvenile homicide offender's youth and attendant characteristics before sentencing him or her to [life without parole].").

It logically and necessarily follows that if a discretionary sentencing scheme is constitutionally sufficient to permit the imposition of a life-without-parole sentence on a juvenile homicide offender, so too can a court impose a sentence that is something less than life without parole. This includes a term-of-years sentence that may amount to a *de*

---

[15] We recognize again that Section 1102.1 applies only to those juveniles "convicted after June 24, 2012." 18 Pa.C.S. §1102.1(a). In *Batts II*, we held that "for purposes of uniformity[,]" courts should examine the Section 1102.1(d) factors "regardless of whether the juvenile was convicted pre- or post-*Miller*." *Batts II*, 163 A.3d at 455 n.23. Although this directive did "not result from a review of the constitutionality of the statute[,]" we saw no problem with instructing sentencing courts "to use the new legislative provision as guidance without making it mandatory." *Id.* at 458 n.25. We likewise see no problem with reaffirming this non-binding requirement even after *Jones*.

*facto* life sentence. Stated differently, as long as the sentence was the product of a discretionary sentencing system that included consideration of the juvenile's youth, the Eighth Amendment is satisfied.

Here, the record makes clear that appellant received the constitutionally required procedure guaranteed by *Miller* and the Eighth Amendment. In resentencing appellant, the court had before it the parties' presentence memoranda, psychological reports, school records, and victim impact statements. It heard testimony from appellant and his mother and read a letter from his cousin. It considered the parties' arguments and evidentiary presentations made at the resentencing hearing. It reviewed "lengthy contemporaneous notes taken during both the trial of this case and during the initial sentencing proceeding." N.T. 10/24/2014 at 51. And it contemplated, "on the record, every one of the twelve factors . . . enumerated in *Miller* and *Batts* [*I*.]" Sentencing Court Op., 2/18/2016, at 5. This process was more than enough to meet the constitutional standard. *See Jones*, 141 S.Ct. at 1322 ("The resentencing in Jones's cases complied with [*Miller*] because the sentence was not mandatory and the trial judge had discretion to impose a lesser punishment in light of Jones's youth.").

## IV. Conclusion

Though we might prefer the more expansive view of *Miller* as seen through the lens of *Montgomery*, we cannot ignore that *Jones*'s interpretation is controlling as a matter of Eighth Amendment law. And because that decision abrogates our foundational understanding in *Batts II* that a juvenile homicide offender cannot constitutionally receive a sentence of life without parole unless he or she is proven to be permanently incorrigible, the procedural protections we adopted in that case to ensure that result are no longer tenable as an exercise of this Court's power of judicial administration. Therefore, when sentencing juvenile homicide offenders from this point forward, sentencing courts are

required to consider only the relevant sentencing statutes, which will guarantee that the sentencer considers the juvenile's youth and attendant characteristics as required by *Miller*. So long as the sentence imposed is discretionary and takes into account the offender's youth, even if it amounts to a *de facto* life sentence, *Miller* is not violated. Because the sentencing court in the present case followed this procedure, we affirm.[16]

Chief Justice Baer and Justices Todd and Mundy join the opinion.

Justice Donohue files a concurring opinion in which Justice Todd joins.

Justice Wecht files a dissenting opinion.

Former Justice Saylor did not participate in the decision of this matter.

---

[16] The upshot is that an overwhelming majority of juvenile homicide offenders in this Commonwealth were resentenced long before the High Court's decision in *Jones*. *See* Pennsylvania Department of Corrections, Juvenile Lifers Information, https://www.cor.pa.gov/About%20Us/Initiatives/Pages/Juvenile-Lifers-Information.aspx (last visited Feb. 22, 2022) (indicating that out of a population of 521 juvenile homicide offenders, 474 have been resentenced, including 271 individuals who have been released on parole). Nothing in *Jones* or this opinion should be interpreted as calling these finalized sentences into doubt.

We also note that *Jones* did not resolve whether a juvenile homicide offender may raise a viable as-applied Eighth Amendment claim challenging the disproportionality of a given sentence. *See Jones*, 141 S.Ct. at 1322 ("this case does not properly present — and thus we do not consider — any as-applied Eighth Amendment claim of disproportionality regarding Jones's sentence."), *citing Harmelin v. Michigan*, 501 U.S. 957, 996–1009 (1991) (Kennedy, J., concurring in part and concurring in judgment). As well, we stress that *Jones* "does not preclude the States from imposing additional sentencing limits in cases involving defendants under 18 convicted of murder." *Id*. at 1323. Our General Assembly remains free at any time to legislatively reimpose the *Batts II* procedures, or to enact any other appropriate measures. We merely conclude that we lack the power to impose such requirements because they are not constitutionally required.